[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The parties to this action, both minors, are unmarried high school students and the parents of David Dunn, who was born August 8, 1990, and was simultaneously placed in the physical custody of Catholic Family Services, preparatory to adoption. Catholic Family Services promptly sent the newborn child to a foster home.
On September 11, 1990, approximately one month later, plaintiff father filed a complaint seeking sole custody. On October 1, 1990, the parties entered into a stipulation dealing with, inter alia, the appointment of an attorney for the infant child, pendente lite custody, certain costs, visitation, and a Family Relations custody study.
On November 2, 1990, a three day trial was held before Judge Joseph Morelli, granting, inter alia, joint custody pendente lite, primary residence with the defendant mother and access to the infant by the plaintiff father on Saturdays at 10 am to Sundays at 10 am and two weekdays from 4 pm to 8 pm. The infant was thereupon removed from the foster home and transfered to his primary residence.
A Family Relations custody study was completed on March 29, 1991. It recommended joint custody with primary residence to the father and visitation to the mother Tuesday and Thursday evenings and alternate weekends from Fridays at 4 pm to Sundays at 8 pm.
The trial upon which this memorandum is based began on December 11, 1991. When the trial was underway, plaintiff father filed a motion seeking joint custody. The parties waived notice and the twenty day waiting period. The filing was accepted.
Attorney Richard Goodman appeared for plaintiff father,
Attorney Charles Karanian for defendant mother, and
Attorney Elizabeth A. Zembko for the infant, David.
The nominal principals in this dispute are the two unmarried minors, parents of the infant child. The mother, Jessica, was fifteen years of age when the infant was conceived and born. She had been dating the father, Craig, for four months. Craig, sixteen at the time, will be eighteen on December 30, 1991. Jessica will be eighteen on November 5, 1992. The infant child is now sixteen months old.
The lovers no longer talk to each other in a civil manner, CT Page 10420 nor do their once friendly parents. Where they formerly moved freely between the houses, Jessica welcome at the Salvatores, Craig welcome at the Dunns, all that has changed. When he comes by to pick up his infant son, Craig now must stand at the front door and wait. He is no longer welcome to enter.
Jessica is in the twelfth grade, doing well, as she has throughout her school career. She is college bound and has a job during those hours Craig has access to David. She takes five dollars of her weekly salary for her own spending money, gives her mother one-half of the balance and puts the other half aside for David's future needs.
Craig has an historically poor school record. His past performance is mediocre or worse. His teacher's comments included "rarely participates in classroom activities", "major assignments not completed" and "disruptive in class". He may be reversing that scholastic behavior, however. He has transferred to Southington's Alternative High School where the comments now read: "I would take ten Craig's (sic) in any class!" and "Craig is a student whom his peers admire. He's outgoing, has a good sense of humor, responds well to interacting in class, and does quite well with his academics. An all around solid student!"
Craig is unemployed. He has had three jobs in the recent past, each lasting about one month, each discarded by him. He testifies a job is unnecessary: his parents provide for him.
The parents of the unmarried parents, grandparents to the infant child, finance this custodial battle and have made major changes in their lives to take on the responsibilities generated by the rejection of the adoption option. When problems arose, it was the paternal grandmother who contacted Craig's attorney or the infant's attorney. It was the paternal grandmother's battle. Craig lost control. The paternal grandparents thrust these complex child rearing issues into the lives of these young parents by gaining Craig's agreement to decline adoption and by their continuing custodial stance.
Once exercised, the rejection set into motion forces which will forever change the live of the infant child, who now faces life between warring parents and antagonistic grandparents.
It will forever change the life of the young mother, who is now employed during twelfth grade to meet some of the financial responsibilities of parenthood and who must now deal with the burdens of motherhood while pursuing her education. Her earlier desire for adoption was not without some logic. CT Page 10421
As for the young father, the need for maturity sometimes comes before we are prepared for it. When Jessica became pregnant, Craig became torn between the two women in his life.
Jessica, unmarried and sixteen years old, had college ambitions and skills. Given the choice, she thought it best for herself and for the infant child to give him a life with a united family who could dedicate their joint parental energies to his welfare.
Craig's mother wanted the child. She could raise it and give it love.
Torn between the two, Craig did not reach his own conclusion and express it clearly to both sides. He took what he thought was the easier alternative and agreed with whomever he was with at the time. Had he thought it through and taken a position earlier, much of the current agony might have been averted. The true parties in interest, the parents of Jessica and the parents of Craig, might very well have been able to negotiate a mutually acceptable result.
By giving each side the impression he did not disagree with their position, he sowed the seeds that he now must reap. Jessica feels betrayed. His mother is angered. He has lost the love of the woman for whom he still professes deep affection and has been forced to assume the role of spokesman for his mother's grandmotherly ambitions. Everyone has been alienated. It is likely that Craig's life, too, will forever be changed.
As between the two parents' testimony, this court finds the mother, Jessica, to be the more credible witness.
There was much testimony offering differing versions of the early, emotional history of the dispute between adoption and custody. Having made the findings discussed above, the details of that history are no longer relevant. The child is alive and well, warmly received by each family and eagerly sought be each. This court's responsibility is not to penalize any of the parties for their early behavior, much of which was petty, but to identify the current best interests of the infant child.
The court was offered the recommendations and observations of three witnesses: the Family Relations Counselor assigned to evaluate the best interests of the infant child, Donna Russak; the well regarded psychiatrist, Dr. Walter Borden, who was retained by the mother at such a late date he was unable to provide his normal typewritten report to the court; and the court appointed attorney for the minor child, Elizabeth M. Zembko. CT Page 10422
Counselor Russak completed her report on March 29, 1991. Her final meaningful fact gathering interview was during February of 1991. Thus, her last information about this sixteen month old infant was when he was six months of age. When the minor is so very young, a ten month gap represents the majority of the infant's life and thus denies the court an insight into the crucial present best interests of the child. That might not be so if the court were concerned with determining the best interests of an older child.
Dr. Walter Borden was hired by the defendant mother to review Counselor Russak's report and to assess the infant and the Dunn family. The court is always fortunate to have the benefit of insights from a psychiatrist as experienced and as competent as Dr. Borden. But the benefits to be derived from his report are necessarily limited by the extent of his investigation. In this case, Dr. Borden interviewed only one of the two families involved in the dispute. He spoke only to the family that hired him: Jessica, her parents and one of her brothers. He did not speak to Craig and his parents. His limited inquiry limits the value and the utility of his testimony.
Counsel are well advised, if they wish to offer this court the benefit of a child centered evaluation, to either negotiate a mutually acceptable expert who will be given voluntary access to all the principals or, if such an agreement is not possible, to request the court to appoint an expert and to order all principals to make themselves and their records available to that expert.
Dr. Borden did provide one clear benefit to the court. He presented a clear current picture of the infant: a bright, healthy and intellectually adept child, who is clearly a tribute to the effective parenting he receives from the families involved. The doctor spoke admiringly of the infant's remarkable concentration and alertness, describing him as the "best adjusted youngster I have seen of his age in my office in my twenty six years."
Towards the conclusion of the trial, the attorney for the minor child, Elizabeth Zembko, asked to testify and present her recommendations. Both of the attorneys for the competing parents agreed. Attorney Zembko took the stand, testified, was subject to cross examination and relinquished her role as attorney for the minor child.
The circumstances of this case raise many issues regarding the role of the attorney for the minor child. If Attorney CT Page 10423 Elizabeth Zembko were offered to the court as an expert witness, seeking to offer her evaluation of the custodial issues, she would not likely qualify as a child expert. Attorney Zembko is a 1986 graduate of the Thomas M. Cooley Law School in Michigan. On inquiry, she offered no child centered degrees, no series of child centered studies or other source of child centered expertise. Does her court appointment as attorney for the minor child cloak her with such expertise by judicial decree? Can her custodial recommendation provide a valid base for a court's judgment in a fact situation such as this? If she does testify, is it appropriate for the infant child to be stripped of representation for the balance of the trial?
Section 46b-54 of the Connecticut General Statutes, is vague. Though the role of attorney for the minor child is vigorously, and appropriately, championed by our appellate courts (Yontef v. Yontef, 185 Conn. 275, 284 (1981); G.S. v. T.S.,23 Conn. App. 509, 515 (1990), the issues detailed above have not yet been explored by those courts. Until there is greater clarification, this trial court, in this fact situation, will not give credence to the recommendations of this court appointed attorney for the minor child.
The families have each been living under the debilitating stress of the uncertainty generated by the custodial dispute. The strain was evident throughout the trial. The strain was also evident in the behavior of the parties, and their parents, in many of the uncharacteristically petty behaviors that preceded the trial. It is clearly in the best interests of all, including the minor child, to resolve this dispute, to enter orders at this time and to allow the parties to move on with their lives.
Fortunately, in spite of the absence of a detailed current report from a child expert who has had access to all the principals, adequate testimony exists to enable the court to enter findings and render a judgment.
If Craig Salvatore has hopes of increasing his access to David as he matures, and of increasing his parenting role in David's development, it is likely that future courts would look with interest at how well Craig takes on the challenges of his own life, his school work and his employment, as well as his participation, together with his parents, in meaningful communication and parenting counseling with Jessica and her parents. None of those challenges will be easy for Craig to achieve, but the manner in which he approaches those issues will tell much about his competence and his sincerity. Because this situation has generated such pain for Jessica and her parents, it may not be an easy matter to convince them that they should expose themselves to further stress by entering CT Page 10424 into counseling with Craig and his parents, but the obvious affection of all the Dunns for young David, and the obvious benefits to the child of such an accommodation, is likely to make the Dunns willing to extend themselves still further.
The basic good will of the Dunn family, in the midst of the stress of this trial, was perhaps best demonstrated by the moderate, though forceful, tone they permitted their attorney to maintain. Though firm in his resolve, Attorney Goodman never became so adversarial that he spoke in terms likely to gratuitously estrange the Salvatore family. He avoided inflammatory comments and was dignified throughout, with their obvious approval.
The need to communicate is particularly important for Craig's parents, who have set in motion a chain of events that has alienated the Dunn family and jeopardized the Salvatore's relationship with young David and his physical custodial family. Changing the current adversarial atmosphere to a cooperative one will take effort, and a willingness to recognize past errors, but Laura Dunn is a loving grandmother, fully capable of recognizing another grandmother's pain and longing and she is likely to respond to sincere and appropriate overtures.
Clearly, in this Christmas season, focused on love for an infant child, reconciliation would be the most wonderful gift the two families could possibly give the young David they both love.
ORDERS:
Having reviewed the evidence and the sworn financial affidavits of each party in the context of the required considerations set forth in Title 46b, Chapter 815j of the Connecticut General Statutes, the following orders shall enter:
1. CUSTODY
a. The parties shall each have joint legal custody of the minor child.
b. Primary physical custody of the minor child shall be with the defendant mother.
c. The joint legal custodians shall consult with one another on major decisions affecting the child's health, education and welfare.
d. The grandparents of the minor child are not to participate in such consultations unless both parents agree to invite their CT Page 10425 participation.
e. If a consultation does not produce an agreement after an exchange of views and an exploration of alternatives, the primary physical custodian shall have the final decision making power.
f. Each of the parents shall exert every effort to foster a feeling of affection between the children and the other parent. Neither parent shall do anything which would estrange the child from the other parent, which would injure the opinion of the child as to their mother or father, or which would impair the natural development of the child's love and respect for each of the parents or their family.
2. ACCESS
a. Plaintiff father shall have access to the minor child on:
i. the second and fourth weekends of each month, from Friday at 6 pm to Sunday at 7 pm and
ii. the first and third weeks of each month, from Wednesday at 4 pm to Thursday at 9 am.
3. HOLIDAYS AND VACATIONS:
a. Parents shall alternate Memorial Day, Labor Day, Thanksgiving, Christmas Eve and Christmas Day.
b. Mother will establish the alternating schedule.
c. Father shall have Father's Day. Mother shall have Mother's Day.
d. Each of the parties shall enjoy similar and equal vacations with the minor child. The terms of those similar and equal vacations are to be negotiated by the parents of the child, without resort to the physical custodian's final decision making powers.
e. The court specifically empowers, and encourages, the parents to vary any portion of the visitation, holidays and vacations in any mutually agreeable manner.
4. CHILD SUPPORT
a. The court finds Craig Salvatore to have an earning capacity of $54 per week.
b. The court further finds the Child Support Guidelines to CT Page 10426 be inappropriate and inequitable, given the facts of this case.
c. The court rejects the recommendation of the non-custodial parent's self support reserve. Credible testimony establishes that Craig is fully supported by his parents and requires no such reserve.
d. Plaintiff father shall pay defendant mother, by mail, $25 per week, the check to be received by her no later that the first Friday following the date of this decision and each and every Friday thereafter.
e. The child support funds are not to be supplied by the parents of Craig Salvatore, directly or indirectly.
5. MEDICAL INSURANCE
a. As recommended by defendant mother, this court orders that medical insurance for the minor child shall be the responsibility of the Mother for as long as the minor child is eligible for coverage at the maternal grandfather's place of employment at no additional cost to the maternal grandfather.
b. Unreimbursed medical, dental, prescription, orthodontic, mental health expenses and all other expenses related to the physical and mental health of the minor child shall be divided equally between the parties and shall be paid promptly when billed.
c. Section 46b-84(c) of the Connecticut General Statutes shall apply. Defendant mother's attorney shall supply her with a copy of that statute and review it with her in detail.
6. TAX EXEMPTION
a. Defendant mother shall be entitled to claim the minor child as her tax exemption.
b. Plaintiff father is directed to complete any tax documents necessary to achieve that result.
7. NEGOTIATIONS
a. The court recognizes that the parties may have mutual preferences that have not been revealed to the court during the trial or which the court may otherwise have inadvertently thwarted.
b. Final terms established by the parties themselves are historically more comfortable for the parties to live with and CT Page 10427 abide by. Therefore, the court empowers the parties to confer and to seek mutually acceptable variations of the court's orders.
c. Any such mutually negotiated modification are to be submitted directly to the undersigned in written form signed by both counsel as well as the plaintiff and the defendant not later than thirty days after this judgment, without costs and without the need to establish a substantial change of circumstances.
d. Beyond that date, or before any other court, modifications shall be by the traditional route and must meet all the more formal requirements.
7. APPEAL
All foregoing orders with respect to custody and visitation shall stand and operate as interim orders of this court during the pendency of any appeal.
JOSEPH L. STEINBERG, JUDGE